# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANN H. ROSS, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 02-2404 (RCL)** |
| ) | |
| **DYNCORP, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the defendants' Motion [17] for Summary

Judgment.  Upon consideration of the defendants' motion, the opposition thereto, the reply brief,

the applicable law, and the entire record herein, the Court concludes that the defendants' motion

will be granted.  Accordingly, summary judgment will be issued in favor of the defendants on all

of the plaintiffs' claims, and those claims will be dismissed with prejudice.  The Court's reasoning

is set forth below.  As summary judgment requires that the factual record be construed in the light

most favorable to the non-moving party, the factual background recited below is drawn from the

plaintiffs' complaint, the plaintiffs' opposition to the defendants' motion for summary judgement,

and the parties' stipulations regarding facts that are undisputed.

## FACTUAL AND PROCEDURAL HISTORY

This case involves wrongful death and survivorship actions brought by the family and

estate of Alexander Wakefield Ross ("Ross") against Ross's former employer, DynCorp.  Ross

was employed by DynCorp as a computer technician under a Foreign Service Contract, which

required that Ross work on projects undertaken by DynCorp pursuant to by a particular contract

between DynCorp and the United States Department of State ("the Contract"). Under the Contract DynCorp was to provide aviation support services for the Columbian army's drug eradication efforts in Columbia, South America.[1]  See generally Contract No. S-OPRAQ-98-C-0051, Labeled as DYNC 00156-00362, and amendments thereto Labeled as DYNC 00001-00155.

DynCorp's primary responsibilities under the Contract were "1) the eradication of narcotics through aerial fumigation, 2) the training of pilots and mechanics to fly and maintain aircraft used in the counter-narcotics efforts, and 3) the interdiction of narcotics processing laboratories and narcotics being transported within the country;"  Defs.' Stmt. of Material Facts Not in Dispute ("Defs.' Stmt."), ¶ 8; and its "secondary missions" were "transport of personnel and supplies, reconnaissance, search and rescue of personnel due to downed aircraft or hostile action by narcotics producers or traffickers, medical evacuation, ferrying of aircraft, and maintenance of aircraft."  Id. at ¶ 9.  The Contract was awarded to DynCorp after a competitive bid process opened in 1996; and was funded, for the most part, under the relevant appropriations-authorizing provisions the federal Foreign Assistance Act.  See generally 22 U.S.C. §§ 2291 et seq. (entitled: "Chapter 32. Foreign Assistance; Subchapter I. International Development; Part VIII. International Narcotics Control").  However, during fiscal year 2002, DynCorp received approximately $1.3 million in supplemental funding from the United States Department of Defense rather than through the Foreign Assistance Act, in order to obtain a "blackhawk night vision goggle pilot to train Columbian Army aviators to fly with night vision goggles."  Pls.' Stmt. of Material Facts in

---

[1]More specifically, the Contract was executed between the State Department and DynCorp Aerospace Technology, "a divisional unit of Dyncorp."  See Defs.' Stmt. of Material Facts not in Dispute, ¶ 3; Defs.' Mot. for Summary Judgment, Ex. 3 (Cameron Aff.), at ¶ 9. Because DynCorp Aerospace Technology is not "a separate entity," Defs.' Mot. for Summary Judgment, Ex. 3 (Cameron Aff.), at ¶ 9, the Contract is, in all respects relevant to the Court's evaluation of the present motion, between the State Department and DynCorp.  These facts are undisputed by the plaintiffs.  See Pls.' Response to Defs.' Stmt. of Material Facts not in Dispute, ¶ 3.

Dispute ("Pl.'s Stmt."), 4.[2]

The Contract contains provisions that reference the federal Defense Base Act, 42 U.S.C. §§ 1651 et seq., which: (1) provide that DynCorp must "obtain Defense Base Act Insurance for all employees who will be working overseas under this contract[;]" Defs.' Stmt., ¶ 15; (2) "expressly reference[] the [Defense Base Act] in allocating funds for insurance[;]" id. at ¶ 15; and (3) "specif[y] that [DynCorp] shall procure [Defense Base Act] worker's compensation insurance." Id. at ¶ 17.

Ross, having been hired specifically to contribute to DynCorp's performance under the Contract, was stationed in Columbia.  On or about August 1, 2002, Ross was instructed "to perform marshalling on an OV-10 aircraft stopped in Villa Garzon in the Putamayo province of Columbia," which involved "signaling the aircraft during take off and landing ... while the aircraft was 'hot refueling', meaning [refueling] with its engines on and its propellers still running." Compl., ¶ 16.  During this process, Ross "sustained massive injuries to the right side of his face and head[,]" which injuries were inflicted by "the propeller of an OV-10 twin engine spray aircraft." Id. at ¶ 18.  On August 1, 2002, Ross died as a result of these injuries.

Although some of the facts surrounding the return of Ross's remains to the plaintiffs—his family—in Panama are disputed by the defendants, the Court will rely upon the plaintiffs' characterization of these events in keeping with the necessity of factual review favoring the non-moving party in a summary judgment inquiry.  The plaintiffs learned of Ross's death on August 1,

_____

[2]The parties stipulate that, under the Contract at issue here, DynCorp was "responsible for supplying aircrews for aircraft and planning, coordinating, and performing 'day, night, night vision goggle, spray, training, interdiction, transport, reconnaissance, search and rescue, medevac, and ferry' flight missions."  Defs.' Stmt., ¶ 11; see Pls.' Response to Defs.' Stmt. ("Pls.' Resp."), ¶ 11 (indicating that this statement is undisputed).  Thus, according to the parties' stipulation, the $1.3 million DynCorp received from the Department of Defense represents a portion of the total funding DynCorp received for its performance under the specific Contract at issue here.

2002, and informed DynCorp that same day of their wish that the remains first be sent to Florida

for an autopsy and then returned to Ross's family in Panama.  See Pls.' Stmt. at 5; Pls.' Opp. to

Defs.' Mot. for Summary Judgment ("Pls.' Opp."), Ex. F (Ross Aff.), at ¶¶ 1, 6.  DynCorp,

however, professed uncertainty as to whether DynCorp would absorb the expenses of transporting

the remains and, indeed, as to whether the remains could be shipped at all.  See id. at ¶6.  On

August 2, the family again contacted DynCorp to request that Ross's remains be forwarded to

Florida as soon as possible, at which time a DynCorp representative assured the plaintiffs that the

remains would be transported the following day.  See id. at ¶ 7.  But the remains were not shipped

as promised, and the distraught family repeatedly attempted to contact DynCorp on August 3 and 4

to determine when the remains would be moved to Florida.  See id. at ¶¶ 8–10.  It is undisputed

that the Columbian government was closed on August 3 and 4 for the weekend and that this

closure made arranging the transport on those days impossible.  See id. at ¶¶ 26.  By Monday,

August 5, the plaintiff family members were "suffering from extreme mental anguish" as a result

of DynCorp's twin failures to comply with their request regarding the transportation of the remains

and to provide the family with information regarding the circumstances of Ross's death.  See Pls.'

Opp. at 22; Pls.' Opp., Ex. F (Ross Aff.), at ¶ 13; Pls.' Opp., Ex. G (Caceres Aff.), at ¶ 10.

On Tuesday, August 6, unable to bear any further delay, the Ross's family informed

DynCorp that they no longer wanted Ross's remains sent to Florida, and requested that they

instead be forwarded immediately to the family in Panama.  See Pls.' Opp., Ex. F (Ross Aff.), at ¶

14.  Columbian government offices were again closed on Wednesday, August 7, for the

presidential inauguration.  See id. at ¶ 29.  Ross's remains were delivered to his family in Panama

on Thursday, August 8, 2002—seven days after the day he died.  See Def.'s Stmt., ¶ 23.

Throughout the time-period during which DynCorp was attempting to arrange for transportation of Ross's remains, "DynCorp personnel were in regular contact with plaintiffs Michael Ross and Ann Ross via telephone and email." Id. ¶ 31.  Additionally, the State Department conducted an investigation of Ross's accident and subsequently prepared an accident investigation report that was delivered to DynCorp in October, 2003.  Id. ¶¶ 35–36.

The plaintiffs filed this suit against DynCorp on December 6, 2002.  Their complaint contains the following counts arising out of Ross's injury and subsequent death: (1) Negligence, see Compl. at 9; (2) Negligence in the Conduct of an Ultrahazardous Activity, with the "ultrahazardous activity" being the so-called "hot refueling" procedure, see Compl. at 10; (3) Negligence Per Se, alleging that DynCorp violated its internal "regulations and policies and/or those of the U.S. State Department Operation Directives for Columbia, the U.S. Federal Aviation Authority, and/or industry standards" by allowing Ross to participate in the "hot refueling" procedure, see Compl. at 12; and (4) Negligent Supervision, see Compl. at 13.  Concerning DynCorp's conduct in returning Ross's remains to his family and communicating with the family about the circumstances of Ross's death, the complaint charges both Intentional Infliction of Emotional Distress (Count VII), see Compl. at 17, and Negligent Infliction of Emotional Distress (Count VIII), see Compl. at 18.[3]

On January 27, 2003, DynCorp moved to dismiss the plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims on which relief may be granted, arguing: (1) that the plaintiffs' negligence-based claims, in the aggregate, are barred by the

---

[3]Counts V and VI of the plaintiffs' complaint—the procedurally necessary Wrongful Death and Survivorship Action allegations, respectively—and are not at issue in the disposition of the present motion.  As these counts merely allege facts in support of the plaintiffs' standing to sue on their negligence-based claims, any summary disposition of those negligence-based claims will necessitate dismissal of Counts V and VI as a matter of course.

exclusive remedy provisions of the federal Defense Base Act, which incorporates the federal Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 et seq.; and (2) that the plaintiffs have failed to allege sufficient facts to state claims for intentional or negligent infliction of emotional distress.  By Order issued September 30, 2003, this Court denied the defendants' amended motion to dismiss without prejudice and authorized the parties to conduct ninety days of discovery, "limited to discovering facts necessary to determine whether this case may proceed in this Court."  Order, issued Sept. 30, 2003, Docket No. 11.  This Order anticipated the filing of a motion for summary judgment on the issue of whether the bulk of the plaintiffs' claims are barred by the Defense Base Act, and held in abeyance the Court's disposition of the defendants' arguments in favor of dismissal of the plaintiffs' emotional distress claims by denying them without prejudice.

Predictably, the defendants filed the present motion for summary judgment on April 5, 2004.  Therein, the defendants reinstate their argument that Ross's employment pursuant to the Contract falls within the provisions of the Defense Bases Act, which, by its incorporation of the Longshore Act, makes worker's compensation payments the sole remedy available to the plaintiffs for Ross's death.  Additionally, the defendants renew their argument that the plaintiffs fail to sufficiently state claims for intentional and negligent infliction of emotional distress, warranting dismissal of those claims under Rule 12(b)(6).  Alternatively, the defendants contend that they are entitled to judgment as a matter of law because no reasonable jury could find in favor of the plaintiffs on their emotional distress claims on the basis of the evidence presently in the record.

## **DISCUSSION**

Upon reviewing the parties' arguments and all of the evidence in the record, the Court concludes that the plaintiffs fail to create any genuine factual dispute concerning the applicability of the Defense Base Act ("DBA") to the plaintiffs' negligence-based claims. As the plaintiffs do not dispute that those claims share a sufficiently similar legal basis to allow them to be aggregated for the purpose of determining the DBA's applicability, this Court will grant summary judgment in favor of the defendants on all of the plaintiffs' negligence-based claims on the basis of its resolution of the DBA issue alone. Furthermore, the Court concludes that the plaintiffs have failed to adduce sufficient evidence on which any reasonable jury might find the defendants liable for intentional infliction of emotional distress, and thus grants summary judgment for the defendants on that claim as well. Finally, because the plaintiffs conceded at the motion to dismiss stage that their negligent infliction of emotional distress claim is insufficient as a matter of law, that claim will be dismissed under Rule 12(b)(6) without further discussion here. See Pls.' Opp. to Defs.' Amended Mot. to Dismiss, Docket No. 7, at 11 n.8.[4]

## A.      **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment when the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A disputed issue of material fact is genuine

---

[4]The defendants note this concession in their motion for summary judgment, see Defs.' Mot. at 27, and the plaintiffs made no effort to rehabilitate the negligent infliction claim in their opposition. See Pls.' Opp. at 3 n.1.

and therefore precludes summary judgment where the Court determines that a reasonable jury could conceivably find in favor of the non-moving party on that factual issue.  Anderson, 477 U.S. at 248.  However, even where a genuine issue exists as to some material fact, the movant is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

As a general rule, when adjudicating a motion for summary judgment, the Court must "assume the truth of all statements proffered by the party opposing summary judgment" and construe all evidence in favor of the non-moving party.  Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  See Anderson, 477 U.S. at 255; Carter v. Greenspan, 304 F. Supp. 2d 13, 21 (D.D.C. 2004).  Indeed, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  See also Washington Post Co. v. United States Dep't of Health & Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).  However, "some statements are so conclusory as to come within an exception to" the general rule that the non-movant's statements must be fully credited when adjudicating a motion for summary judgment.  Greene, 164 F.3d at 675 (citing as examples Delange v. Dutra Constr. Co., 153 F.3d 1055, 1058 (9th Cir. 1998); Lefkowitz v. Citi-Equity Group, Inc., 146 F.3d 233, 240 (5th Cir. 1998)).  Thus "wholly conclusory statements for which no supporting evidence is offered" need not be taken as true for summary judgment purposes.  Carter, 304 F. Supp. 2d at 21 (citing Greene, 164 F.3d at 674–75).

In order to survive a motion for summary judgment, the non-moving party must establish

more than the "mere existence of a scintilla of evidence" in support of its claims.  Anderson, 477

U.S. at 252.  In order to prevail, the non-movant's opposition must contain more than

"unsupported allegations or denials and must be supported by affidavits or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial."  Carter, 304 F.

Supp. 2d at 21.  See FED. R. CIV. P. 56(e); Celotex, 477 U.S. at 324.  "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477

U.S. at 249–50.  In fact, summary judgment may issue where the movant points to a substantial

lack of evidence in the non-movant's case; see Celotex, 477 U.S. at 322; or where the movant

demonstrates that the non-movant has failed to proffer "evidence on which the jury could

reasonably find for" the non-moving party.  Anderson, 477 U.S. at 252.

## B.      The Plaintiffs' Negligence-Based Claims

The defendants argue that the applicability of one of two sections of the DBA to Ross's

employment under the Contract, either 42 U.S.C. § 1651(a)(4) or 42 U.S.C. § 1651(a)(5), entitles

them to judgment as a matter of law on each of the plaintiffs' four negligence-related

claims—Negligence, Negligence in the Conduct of an Ultrahazardous Activity, Negligence Per Se,

and Negligent Supervision—because the DBA provides that the applicable workers' compensation

scheme will provide the exclusive remedy for injuries to or the death of any employee covered

under the DBA's provisions.  See 42 U.S.C. § 1651(c) (providing generally that the DBA provides

the sole source of liability for employers, without regard to "the workmen's compensation law of

any State, Territory, or other jurisdiction").  The sections of the DBA at issue on the present

motion provide, in relevant part:

> (a) ... Except as herein modified, the provisions of the Longshore and Harbor
> Workers' Compensation Act ... shall apply in respect to the injury or death of

9

any employee engaged in any employment—

> ... (4) under a contract entered into with the United States or any executive department, independent establishment, or agency thereof ... where such contract is to be performed outside the continental United States ... for the purposes of engaging in public work ... ; [or]

> (5) under a contract approved and financed by the United States or any executive department, independent establishment, or agency thereof ... where such contract is to be performed outside the continental United States, under the Mutual Security Act of 1954, as amended ...

42 U.S.C. §§ 1651(a)(4)–(5).

The DBA also provides that "[t]he liability of [a] ... contractor under this Act shall be exclusive and in place of all other liability of such ... contractor ...."  42 U.S.C. § 1651(c).  For any contract covered by the DBA that "is to be performed outside the continental United States," the relevant workers' compensation scheme made applicable to claims related to the injury or death of an employee of the contractor is the Longshore Act, which also expressly excludes all other forms of remedial action against the contractor in the following provision.

> The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of [an employee's] injury or death[.]

33 U.S.C. § 905(a).  As "Section 5 of the Longshoremen's and Harbor Workers' Compensation Act destroys any underlying tort liability of the employer," Robin v. Sun Oil Co., 548 F.2d 554, 556 (5th Cir. 1977), it necessarily displaces all derivative common-law causes of action based on the injury or death of a covered employee caused by employer negligence, including wrongful death and survivorship actions.  See Robin, 548 F.2d at 556–57 (holding, in the course of resolving an action for contribution between co-defendants, that the underlying wrongful death

10

claim of widow of a covered employee was displaced by exclusive remedy provisions of the Longshore Act).

It is undisputed that Ross's employment contract and the Contract were "to be performed outside the continental United States." Thus, if it is established that either § 1651 (a)(4) or § 1651 (a)(5) of the DBA is applicable in virtue of the nature of the Contract, then the remedial provisions of the Longshore Act provide the exclusive remedies for Ross's death, displacing the plaintiffs' common law negligence-based claims against DynCorp. See, e.g., Flying Tiger Lines, Inc. v. Landy, 370 F.2d 46, 52–53 (9th Cir. 1966) (rejecting an argument that the DBA allows an injured employee to elect between state remedies and those provided in the Longshore Act, holding that the language of § 1651(c) of the DBA, quoted above, "clearly reveals a Congressional preference for the federal remedy[,]" and that allowing for election of remedies "would only interfere with the apparent policy of the [DBA] by affording a choice of remedies that was not intended"); Sparks v. Wyeth Laboratories, 431 F. Supp. 411, 417 (W.D. Okla 1977) ("The Defense Bases Act ... makes the exclusive remedy of an employee of a covered government contractor against that contractor a compensation remedy under the [Longshore] and Harbor Workers' Compensation Act ....") (emphasis added).

The Court first considers whether the Contract falls within the ambit of § 1651(a)(5). This subsection covers contracts that are "to be performed outside the continental United States" that are financed under the "Mutual Security Act of 1954," which was repealed and superceded by the Foreign Assistance Act of 1961. See Pub. L. No. 87-195 (1961), codified at 22 U.S.C. §§ 2151, et seq. Subsection 1651(a)(5)'s reference to the Mutual Security Act, then, should be treated as a reference to the Foreign Assistance Act. See Overseas African Constr. Corp. v. McMullen, 500

11

F.2d 1291, 1294–96, 1295 n.10 (2d Cir. 1974).  As the plaintiffs concede that the contract was "to

be performed outside the continental United States," and that it contained the workers'-

compensation-insurance related provisions required by § 1651(a)(5), see Pls.' Resp., ¶¶ 15–17,[5]

the only issue presently before the Court regarding the applicability of § 1651 (a)(5) is whether the

Contract was "financed" in the manner required by that subsection.

Importantly, the plaintiffs do not dispute that the Contract was primarily funded under the

Foreign Assistance Act.  See Defs.' Stmt., ¶ 18 ("The State Department funded its contract with

DynCorp during all relevant times for this action through the Foreign Assistance Act."); Pls.'

Resp., ¶ 18 (disputing only the exclusivity of Foreign Assistance Act funding for DynCorp's

performance under the Contract); Pls.' Stmt. at 4 (alleging that DynCorp received approximately

$1.3 million in funding for activities required by the Contract from the budget of the Department

of Defense and not under the Foreign Assistance Act); Defs.' Mot. for Summary Judgment, Ex. 9

(Todd Decl.), ¶¶ 7–9 (explaining that the two appropriations codes used in the Contract to

document the statutory sources of funding denote financing through Foreign Assistance Act

appropriations mechanisms).

---

[5]Specifically, § 1651(a)(5) provides that:
> every [covered] contract shall contain provisions requiring that the contractor ... (A) shall ...
> provide for securing to or on behalf of employees engaged in work under such contract the
> payment of compensation and other benefits under the provisions of this chapter, and (B)
> shall maintain in full force and effect during the term of such contract ... or while
> employees are engaged in work performed thereunder, the said security for the payment of
> such compensation and benefits ....

42 U.S.C. § 1651(a)(5).  The Contract states, in compliance with the first requirement of this subsection, that
DynCorp is required to "obtain Defense Base Act Insurance for all employees who will be working overseas under
this contract."  Defs.' Stmt., ¶ 15 (quoting Defs.' Mot., Ex. 2 (Contract), at DYNC 002266); see also Pls.' Resp., ¶
15 (noting that plaintiffs do not dispute the presence or effect of this contractual language).  As to § 1651(a)(5)'s
requirement that the contractor actually secure the benefits promised to employees by the statutorily mandated
language in the contract, DynCorp maintains that it "did in fact retain insurance that complies with the DBA."  Defs.'
Mot. at 18 n.5 (referring to Defs.' Amended Mot. to Dismiss, Docket No. 6, Ex. 1 (Whitworth Aff.), at ¶ 2).  As the
defendants note in their motion for summary judgment, the plaintiffs have not disputed, at any stage of this litigation,
DynCorp's actual maintenance of workers' compensation insurance coverage for its employees working under the
Contract.

Instead, the plaintiffs note that DynCorp received a small amount of funding from the budget of the Department of Defense for a single aspect of performance of the Contract.[6]  See Pls.' Opp. at 20; Pls.' Opp., Ex. B (State Dept. Contractor Rept.), at 15.  This observation, the plaintiffs contend, creates a genuine issue of material fact regarding the statutory sources of all financing for DynCorp's performance under the Contract, precluding summary judgment on the question of whether the contract satisfies the funding-source requirement of § 1651(a)(5).  However, the plaintiffs fail to contest William Todd's explanation of the specific sources of funding for the Contract set out in his declaration attached to the defendants' summary judgment motion.  Mr. Todd was, at the time of the filing of his declaration, the Executive Director and Comptroller for the State Department's Bureau of International Narcotics and Law Enforcement Affairs—a position that certainly implies sufficient expertise to speak with authority to the manner in which the Contract was financed.  As such, and in the absence of any objection from the plaintiffs, the Court finds sufficient reason to credit his sworn testimony concerning the statutory mechanism through which the government finances DynCorp's activities.  At most, then, the plaintiffs have created a genuine issue of fact regarding whether the Contract was funded exclusively through the mechanism of the Foreign Assistance Act.

The question remains, however, whether this fact issue is material in the sense required to preclude summary judgment.  Whether or not the funding for the Contract came exclusively

---

[6]The State Department Report on Certain Counternarcotics Activities in Columbia submitted by the plaintiffs as an exhibit attached to their opposition to the defendants' motion for summary judgment indicates that DynCorp received $79.2 million in funding for its work pursuant to the Contract in fiscal year 2002.  See Pls.' Opp., Ex. B (Report), at 4.  Thus, if the $1.3 million disbursed to DynCorp by the Department of Defense was, in fact, not funding "under the Foreign Assistance Act," and if that $1.3 million was paid to DynCorp pursuant to the Contract at issue here, neither of which statement is clearly true on the present record, then non-Foreign Assistance Act funding would only account approximately 1.6 percent of the total funding DynCorp received pursuant to the Contract in 2002 alone.  See id., Ex. B (Report), at 15 (documenting the $1.3 million payment from the Department of Defense to DynCorp).

through the Foreign Assistance Act will only be a material fact issue if § 1651(a)(5) requires such exclusivity of funding as a criterion of applicability.  The Court finds no reason to think that this is the case.  The plain language of the provision indicates coverage for any contract "financed ... under the [Foreign Assistance Act]," and the plaintiffs make no argument that something in the legislative history of this provision should motivate the Court to read this phrase as "exclusively financed ... under the [Foreign Assistance Act]."  "For this court to add [a limiting term to a statutory provision] on its own would be to abjure the basic principle of statutory construction that words are ordinarily to be given their 'plain meaning.'"  Palestine Information Office v. Shultz, 853 F.2d 932, 938 (D.C. Cir. 1988) (declining to construe the term "entity" to mean "commercial entity" in the provision of the Foreign Missions Act that defines what may constitute a foreign mission, 22 U.S.C. § 4302(a)(4); noting that "Congress could have added the term 'commercial entity' if it had wanted to so limit" the range of potential designees); see also United Scenic Artists v. NLRB, 762 F.2d 1027, 1032 n.15 (D.C. Cir. 1985) ("It is an elementary principle of statutory construction that ordinarily the plain meaning of statutory language controls, i.e., 'words should be given their common and approved usage.'").

Further, and contrary to the plaintiffs' contention, the legislative history of § 1651 (a)(5) militates against this artificially restrictive reading of the DBA's coverage provisions.  The plaintiffs cite a Report, issued by the Senate Foreign Relations Committee upon its approval of amendments to the Mutual Security Act of 1954, which explains that the amendments "would extend [the DBA's] coverage to two classes of Mutual Security Program employees [including] employees under contracts financed under the [Mutual Security Act] ... if no coverage is [otherwise] provided under the Defense Base Act[.]"  S. Rep. No. 1627, 85th Cong. (2d Sess.),

14

May 26, 1958.  While the plaintiffs attempt to impute a restrictive meaning to this passage, it actually evidences an <u>expansion</u> of DBA coverage that was but one incident in a trend of similar expansion stretching back to 1942.  The 1942 War Hazards Act, in response to the "uneconomic and discriminatory" situation that had developed during the early days of American involvement in World War II as a result of the DBA's limited coverage for American workers employed overseas, "amended the Defense Bases Act to provide statutory coverage for all employees of contractors engaged in work outside the United States wherever located," among other things.  S. Rep. No. 1886, 85th Cong. (2d Sess.), July 23, 1958, <u>reprinted</u> <u>in</u> 1958 U.S.C.C.A.N. 3321.  After World War II, Congress again expanded DBA coverage by enacting legislation to "change the [DBA's] frame of reference [for determining what kinds of overseas employment would qualify for coverage] from World War II to one of 'national defense' and to redefine the definition of 'Allies.'"  <u>Id.</u> (discussing amendments to the DBA enacted in Pub. L. No. 83-100 (1953)).

In 1958, the DBA was again broadened "to include persons employed overseas by welfare and morale organizations (e.g., American Red Cross, USO, Salvation Army)[;] ... [to] cover both fixed and movable projects including service projects[;] ... to eliminate the World War II frame of reference and to substitute a less limiting frame of reference[;] ... [and] to eliminate the discriminatory exclusion of noncitizen employees ... from the Defense Base Act coverage[.]"  <u>Id.</u> (discussing the effect of H.R. 12140, Pub. L. No. 85-608 (1958), on the Defense Base Act).  In addition, the 1958 Act made the DBA, which had previously required annual re-enactment by Congress, into permanent legislation.  <u>See id.</u>  Congress added § 1651 (a)(5) in a separate 1958 enactment, enlarging yet again the category of employees entitled to coverage under the DBA.  <u>See</u> Pub. L. No. 85-477, § 502(a)(1) (1958).

The history of congressional modification of the DBA, then, is a history of continuous expansion of coverage, persuading the Court that if, as the plaintiffs claim, Congress had intended that a DBA provision apply more narrowly than might otherwise be thought, it would have expressed that intent clearly in the text of the statute itself..  Put differently, Congress certainly could have drafted § 1651 (a)(5) to apply only to contracts "exclusively financed" under the Foreign Assistance Act, but instead chose to employ broader language.  Cf. Shultz, 853 F.2d at 958.  Indeed, Congress expressly excluded at least one category of contracts funded under the Mutual Security Act (now the Foreign Assistance Act) from coverage under the DBA in the text of § 1651 (a)(5) by providing that the subsection does not extend the DBA to contracts "financed under ... title II of chapter II" of the Mutual Security Act unless an exception is approved by the Secretary of Labor.  See 42 U.S.C. § 1651(a)(5).  It would be counterintuitive to suppose that Congress was inclined to expressly exclude one category of properly financed contracts from the ambit of § 1651 (a)(5), but leave its exclusion of another such category to be ferreted out by implication.  The Court declines the plaintiffs' invitation to impute such an unusual intention to Congress in this case.

The plaintiffs' only other argument related to this issue seems to be the claim that a finding by this Court that § 1651 (a)(5) is applicable to the Contract would run contrary to two generally accepted principles of statutory construction.  The plaintiffs note first that § 1651(a)(5) applies only to contracts that are both financed through the Foreign Assistance Act and that are "not otherwise within the coverage of this section."  This language, they continue, prohibits the conclusion that the Contract falls within § 1651(a)(5) where the defendants have argued, in their motions to dismiss and for summary judgment, that the Contract falls within § 1651(a)(4) and thus

"otherwise within the coverage of this section."  The prohibition against such a conclusion is predicated on two interpretive canons: (1) the principle that courts ought not interpret the terms of a statute in a manner that renders any provision of that statute meaningless or redundant; and (2) the principle that specific statutory provisions control more general provisions.  Put more simply, the plaintiffs argue that because § 1651(a)(4) is more specific than § 1651(a)(5), contracts that are covered by the former should be excluded from the latter.  And to conclude otherwise would be to render § 1651(a)(4) meaningless, because every contract covered under that subsection would also be covered under § 1651(a)(5).

Unfortunately, this argument is ultimately unpersuasive.  First, the invocation of the "specific controls the general" interpretive canon adds little to the discussion, as the same principle is expressly incorporated in the clause of § 1651(a)(5) that provides that the subsection will only apply to contracts "not otherwise within the coverage" of the DBA under one of the more specific provisions, such as § 1651(a)(4).  This observation, of course, gives on to question underlying the plaintiffs' broader argument: How is it that the defendants can consistently argue that their contract falls within both §§ 1651(a)(4) and (5) in light of the exclusionary language of the latter subsection?

The form of this question, of course, immediately highlights the second fallacy in the plaintiffs' argument—there is no legal requirement that the defendants' arguments be logically consistent, only that the Court's conclusion be logically consistent.  That is, the realization that a contract could arguably fall within either § 1651(a)(4) or § 1651(a)(5), without more, has absolutely no implication for the meaning and future applications of the statutory text.  Only this Court's conclusion would have such an implication, and only the Court's conclusion that the

Contract legitimately meets all the applicability requirements of both of these subsections would violate the interpretive canons that the plaintiffs invoke.  Of course the express language of § 1651(a)(5) rules out the possibility that a contract could fall within that subsection and § 1651(a)(4)—the plaintiffs' contention to this effect is trivially true, and the defendants do not argue otherwise.  Their argument, rather, is in the form of a conditional sentence: If the Contract does not fall within § 1651(a)(4), then it nevertheless falls within § 1651(a)(5).  The form of this argument requires the defendants to simultaneously argue in favor of both subsections' applicability, but it does not require any inconsistency in the Court's disposition of the DBA applicability issue.

From the form of the defendants' argument and the proscription on the applicability of § 1651(a)(5) to a contract covered under one of the more specific subsections, three dispositions are possible.  First, if the Court concludes that § 1651(a)(4) is applicable, then it follows that § 1651(a)(5) cannot apply of its own terms, and that the plaintiffs' claims are barred by the DBA because the contract falls within § 1651(a)(4).  Second, if the Court concludes that § 1651(a)(4) does not apply, then the applicability of § 1651(a)(5) is not expressly ruled-out, and the plaintiffs' claims will only be barred by the DBA if the Court further concludes that the contract falls within § 1651(a)(5).  Third and finally, if the Court concludes that § 1651(a)(5) applies in the first instance, the applicability of § 1651(a)(4) becomes irrelevant to the disposition of the plaintiffs' claims in this case.  This is because: (1) the plaintiffs' claims are barred if either subsection applies to the contract; and (2) a necessary condition for the applicability of § 1651(a)(5) is the inapplicability of § 1651(a)(4).  That is, if the Court concludes that the Contract satisfies every other condition for the applicability of § 1651(a)(5), it follows that the plaintiffs' claims are barred

by the DBA regardless of the Court's conclusion regarding the applicability of § 1651(a)(4).  If the Court concludes that  § 1651(a)(4) applies to the contract, the plaintiffs claims are barred; and if the Court concludes that § 1651(a)(4) does not apply to the contract, then the only remaining condition for application of § 1651(a)(5) is satisfied and the plaintiffs' claims are barred.

None of these three possible conclusions is analytically inconsistent with either of the interpretive canons set forth by the plaintiffs, as they all respect the control of the specific provision over the general and none render either provision redundant or meaningless. Additionally, the Court's conclusion that the Contract, as a matter of law, satisfies all the conditions § 1651(a)(5) save for the condition that the contract must not fall within any other subsection of § 1651(a) makes it unnecessary for the Court to attempt to determine whether the Contract falls within § 1651(a)(4).  Only two resolutions of that issue are possible—either the subsection applies or it does not—and either resolution entails that the plaintiffs' claims are barred by the exclusive remedy provisions of the DBA in light of the Court's predicate conclusion regarding the applicability of § 1651(a)(5).

Therefore, in light of the relevant legislative history, in accordance with established principles of statutory construction, and consistent with the plain text of the statute, the Court concludes that § 1651(a)(5) applies to a contract that is funded under the Foreign Assistance Act, even where that contract is not exclusively funded under the Foreign Assistance Act.  On the basis of this conclusion, the Court finds that DynCorp's Contract with the State Department satisfies the funding-source criterion for the applicability of § 1651(a)(5) of the DBA.  As the plaintiffs have conceded that the Contract satisfies the other requirements for DBA coverage pursuant to § 1651 (a)(5), the Court concludes that the DBA is applicable to Ross pursuant to the nature of the

Contract.  As a result of the logical relationship between §§ 1651(a)(4) and (5) discussed above,

the applicability of § 1651(a)(5) obviates any need for the Court to address the hotly disputed issue

of the applicability of § 1651(a)(4) to the contract.[7]  Having found that there is no genuine issue of

material fact in dispute regarding the applicability of the DBA to the Contract, under which Ross

was employed, it follows that the Longshore Act provides the exclusive remedies for the plaintiffs,

and that DynCorp is therefore entitled to judgment as a matter of law on the plaintiffs' negligence-

based claims.

**C.      The Plaintiffs' Intentional Infliction of Emotional Distress Claim**

In order to survive a motion for summary judgment on their intentional infliction of

emotional distress claim, the plaintiffs must demonstrate that there exists a genuine issue of

material fact regarding each essential element of that claim.  Recall that a disputed issue of

material fact will preclude summary judgment where the Court concludes that a reasonable jury

could find in favor of the non-moving party on that factual issue.  Anderson, 477 U.S. at 248.  But

"a party who fails to make a showing sufficient to establish the existence of an essential element to

that party's case, and on which that party will bear the burden of proof at trial" cannot survive

summary judgment.  Celotex, 477 U.S. at 322.  Because mere "unsupported allegations or denials"

will not forestall summary judgment, Carter, 304 F. Supp. 2d at 21, the non-moving party must at

least proffer sufficient evidence for each claim to make out each essential element of a prima facie

---

[7]One of the principle disputes between the parties concerning the applicability of § 1651(a)(4) concerns whether certain kinds of foreign counternarcotics activities such as those DynCorp carried out under the Contract should be regarded as "national defense" related activities.  The avoidance of entanglement in this controversy adds structural benefits to the Court's disposition of the present motion, as the Court finds that determinations regarding which federal policies qualify as "national defense" policies are best left to the representative branches of the government.

case—that is, to show that "there is a genuine issue for trial" on each element of each claim.  See
id.

Here, even construing the facts in the light most favorable to the plaintiffs, the Court
concludes that the plaintiffs have failed to proffer sufficient evidence for a reasonable jury to find
that DynCorp's allegedly tortious conduct was sufficiently "outrageous" to incur liability under the
relevant legal standard.  It follows from this conclusion that the plaintiffs are unable to make the
requisite prima facie showing of DynCorp's intent or recklessness, which is most often inferred
from the "outrageousness" of the conduct at issue.  Thus, summary judgment for the defendants is
appropriate on this claim as well.

Under District of Columbia law, which governs the plaintiffs' emotional distress claim by
the parties' implicit stipulation, see Defs.' Mot. at 23–24; Pls.' Opp. at 21 (both relying, without
comment, on D.C. law); a prima facie case of intentional infliction of emotional distress requires
the plaintiff to demonstrate: "(1) extreme or outrageous conduct that (2) intentionally or
recklessly" (3) causes "severe emotional distress to another."  Kerrigan v. Britches of
Georgetowne, Inc., 705 A.2d 624, 628 (D.C. 1997).  With respect to the first element, D.C. law
provides for liability only where "the conduct has been so outrageous in character, and so extreme
in degree, as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable
in a civilized community."  Sere v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982)
(quoting and incorporating the standard set forth in RESTATEMENT (SECOND) OF TORTS § 46 cmt.
d (1965)).  Liability, therefore, "clearly does not extend to mere insults, indignities, threats,
annoyances, petty oppressions, or other trivialities."  RESTATEMENT (SECOND) OF TORTS § 46 cmt.
d.  Importantly, "it is for the court to determine, in the first instance, whether the defendant's

conduct may reasonably be regarded as so extreme and outrageous as to permit recovery ….”

RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (as quoted in Sere, 443 A.2d at 38); Abourezk v.

New York Airlines, Inc., 895 F.2d 1456, 1458 (D.C. Cir. 1990).[8]

---

[8]Contrary to this rule, the plaintiffs insist that “the elements of Intentional Infliction of Emotional Distress are subjective, and hence, not a matter of law.” Pls.’ Opp. at 25. If this statement is construed to be categorical, then it is clearly incorrect because it proves too much—if the elements of the emotional distress claim were not subject to resolution as a matter of law, then no such claim would ever be dismissed or subject to adverse summary judgment. A plaintiff, simply by alleging such a claim in his or her complaint, could secure jury consideration and thereby circumvent the entire process of pretrial disposition.  While this result may not be overly troubling, quite troubling indeed is the observation that, on the plaintiffs’ account, there would be no judicial mechanism for enforcing the requirement of pleading a prima facie case of intentional infliction of emotional distress, as any dismissal of such a claim on that ground would be a judgment as a matter of law.

Reading this statement more charitably, one might say that the plaintiffs mean to argue that the nature of the elements of this specific tort require proof by facts that will vary greatly from one case to another, and thus are not particularly amenable to applications of the sort of general legal standards that usually justify judgments as a matter of law.  An example of a matter that it “subjective” in this sense is the specific intent of an alleged tortfeasor to cause, by his or her allegedly tortious act, the injury of which the plaintiff complains.  See, e.g., Waldon, 415 A.2d at 1075 n.18 (“the inquiry into liability producing intent is subjective: i.e., did appellees intend to cause severe emotional distress including the risk of physical injury”).  On this reading, then, the plaintiffs merely assert that in most cases the fact-specific manner in which the elements of the intentional infliction of emotional distress tort are established will make it difficult for a defendant to win judgment as a matter of law on such a claim.  Of course, there is no inconsistency between this claim and the Court’s statement that there must be a judicial determination, in the first instance, that the plaintiffs’ claim satisfies minimum requirements of evidentiary sufficiency—while the elements of the tort may be fact sensitive, where the facts alleged are simply insufficient to support liability, judgment as a matter of law will nevertheless be appropriate.

The cases that the plaintiffs cite in support of their contention buttress the Court’s conclusion in this regard. In the portion of Barber v. Kohn that the plaintiffs cite, Magistrate Judge Attridge explained that “[s]ince the defendant’s subjective intent to inflict emotional distress can seldom be proven directly, the requisite intent may be inferred by the trier of fact ‘from the very outrageousness of the defendant’s acts.’” 1991 WL 3243 at *2 (D.D.C. 1991) (quoting Waldon, 415 A.2d at 1077).  This statement of legal principle, upon which this Court also relies in the present case, does not somehow remove the plaintiffs’ emotional distress claim from the realm of claims subject to summary disposition—quite the contrary, Magistrate Judge Attridge granted summary judgment against the Barber plaintiff on an intentional infliction of emotional distress claim for failure, as a matter of law, to allege sufficiently “outrageous” conduct by the defendant.  See Barber, 1991 WL 3243 at *3.  Now the court in Qutb v. Ramsey, to be sure, did not summarily dispose of the plaintiff’s emotional distress claim.  See 285 F. Supp. 2d 33, 51–52.  Nevertheless, the Qutb court made no statement in support of the proposition that intentional infliction of emotional distress claims are for some reason immune to judgment as a matter of law, but rather simply found that summary judgment was inappropriate because the plaintiff had put forward sufficient evidence to make out a prima facie case for the claim.  See id.  The negative implication of this holding is, of course, that judgment as a matter of law on the basis of evidentiary insufficiency would have been appropriate but for the plaintiff’s production of adequate evidence.

The discussion in Waldon sheds more light on the “subjective” or “objective” nature of the various elements of intentional infliction of emotional distress.  After noting that “the inquiry into liability producing intent is subjective,” the court explained that the commonly misunderstood distinction between the objective proximate cause inquiry with the subjective inquiry into intent “is further complicated when [defendants’] intent must be inferred from the nature of their acts.”  Waldon, 415 A.2d at 1075 n.18.  This circumstance complicates matters because although the element of intent is generally a subjective issue—that is, a specific factual issue relating to what was in the mind of the specific defendant—the question to be addressed where intent must be inferred from the character of the defendant’s conduct is “whether a reasonable [person] performing these given acts could be presumed to have

The second essential element of the tort—the intent or recklessness of the defendant—"is normally a factual question for the jury," Waldon v. Covington, 415 A.2d 1070, 1078 (D.C. 1980), just as the plaintiffs correctly observe.  See Pls.' Opp. at 21.  Again, however, "a court must [initially] determine whether the plaintiff[s'] allegations, viewed in the light most favorable to the plaintiff, are minimally sufficient to show the existence of such intent." Waldon, 415 A.2d at 1078.  Where direct evidence is for some reason lacking, intent or recklessness "may be … [inferred] … from the very outrageousness of a defendant's conduct." Sere, 443 A.2d at 37 (citing Waldon, 415 A.2d at 1077).  While both the "outrageousness" of conduct element and the element of intent or recklessness are quite fact sensitive, the Court must nevertheless "'set outer limits' on what may go to the jury." Waldon, 415 A.2d at 1078 (quoting 2 HARPER & JAMES, THE LAW OF TORTS 881 (1956)).

The third and final element requires a showing that the defendant's conduct caused "severe emotional distress" to the plaintiff.  D.C. courts require a plaintiff to demonstrate that the defendant's conduct caused him or her to suffer "emotional upset 'of so acute a nature that harmful physical consequences might not be unlikely to result'" in order to satisfy this element.  Sere, 443

---

foreseen causing emotional distress ...." Id. (emphasis added).

    The question of the intent of an individual defendant to cause emotional distress, then, is subjective in the above-discussed sense—its resolution depends crucially on the specific facts of the particular case at issue (what was actually in this defendant's mind) rather than any reference to the hypothetical "reasonable person."  However, answering the question whether a defendant's conduct is of the sort from which intent to cause emotional distress may be inferred necessarily requires an objective inquiry.  In the latter inquiry, because there is no evidence to demonstrate what was in this specific defendant's mind, the Court must determine whether a reasonable person would only engage in the challenged conduct if he or she intended to cause the plaintiff emotional distress.  The obvious conclusion is that where, as here, the intent element of the intentional infliction of emotional distress tort must be inferred from the defendant's conduct because direct evidence of intent is unavailable, the intent inquiry becomes objective rather than subjective.

    Thus, while the plaintiffs' argument may be correct insofar as one element of intentional infliction of emotional distress—the intent or recklessness of the defendant—may be "subjective" in most cases, it has no applicability in this case, where the dearth of evidence regarding DynCorp's intent requires the Court ask the objective question whether intent may be inferred from DynCorp's conduct.

A.2d at 37 (quoting <u>Clark</u> v. <u>Associated</u> <u>Retail</u> <u>Credit</u> <u>Men</u>, 105 F.2d 62, 65 (Fed. App. D.C.but

mere "'mental anguish' and 'stress' [do] not rise to the level of [severity] required by the case

law." <u>Futrell</u> <u>v.</u> <u>Dept.</u> <u>of</u> <u>Labor</u> <u>Federal</u> <u>Credit</u> <u>Union</u>, 816 A.2d 793, 808 (D.C. 2003) (citing <u>Sere</u>,

443 A.2d at 37).  1939)).  Mere "'mental anguish' and 'stress' [do] not rise to the level of

[severity] required by the case law." <u>Futrell</u> <u>v.</u> <u>Dept.</u> <u>of</u> <u>Labor</u> <u>Federal</u> <u>Credit</u> <u>Union</u>, 816 A.2d

793, 808 (D.C. 2003) (citing <u>Sere</u>, 443 A.2d at 37).  While tort law historically required some

physical manifestation or symptom of the alleged emotional distress as a condition for recovery,

current D.C. law allows "an action for intentional infliction [of emotional distress to] be made out

even in the absence of physical injury or impact." <u>Waldon</u>, 415 A.2d at 1076.

Here, in order to survive the defendants' motion for summary judgment, the plaintiffs must

at least establish some triable issue fact issue concerning each of these elements—that is, they

must preset evidence sufficient to convince the Court of the possibility that a reasonable jury could

find in their favor on this claim.  Thus the Court, viewing the facts in the light most favorable to

the plaintiffs and making all rational inferences from those facts in the plaintiffs' favor, must first

find at least some evidence to indicate that the defendants' conduct was, indeed, sufficiently

"outrageous" to support the imposition of liability under D.C. law.  Only after the Court makes this

initial determination, contrary to the plaintiffs' contention, does the question "whether the

elements of intentional infliction of emotional distress are established" become "a question of fact

for the jury to decide."  Pls.' Opp. at 21.

Two instances of DynCorp's conduct allegedly satisfy the "outrageousness" element.

First, the plaintiffs claim that DynCorp intentionally and unjustifiably delayed transporting Ross's

remains—first to Florida, and then to Panama after the family notified DynCorp that shipment to

Florida was no longer necessary.  Second, the plaintiffs claim that DynCorp intentionally and

unreasonably withheld information regarding the circumstances of Ross's death.  The Court will

discuss these two instances of conduct individually.

As to DynCorp's delay in transporting Ross's remains, the defendants allege and the

plaintiffs do not dispute that the offices of the Columbian government were closed on August 3, 4,

and 7, that this closure delayed DynCorp's efforts to transport the remains to the plaintiffs, and

that the remains were delivered to the plaintiffs in Panama on Thursday, August 8.  Thus, the only

periods of delay with which the Court is concerned here are the time between Thursday August 1

and Friday August 2, and the time between Monday August 5 and Tuesday August 6.  It is

undisputed that the plaintiffs initially instructed DynCorp to deliver the remains to Florida, and

that on August 6, the plaintiffs informed DynCorp that they instead wished for the remains to be

forwarded directly to Panama.

Taking into account all relevant circumstances, the Court concludes that a delay of four

business days, which is all that is at issue here, simply does not rise to the level of outrageousness

required to state a prima facie case for intentional infliction of emotional distress.  The defendants

argue that they made the necessary arrangements for transportation of the remains as soon as

possible, and that they had no desire to cause the plaintiffs any harm—at bottom, that a delay of

four business days was reasonable under the circumstances.  In response, the plaintiffs charge that

DynCorp intentionally delayed forwarding Ross's remains to Florida out of a desire to avoid the

autopsy that the plaintiffs planned to have performed there.  See Pls.' Opp. at 23; id., Ex. F (Ross

Aff.), at ¶ 13 ("On ... August 6, we decided that DynCorp was likely delaying the shipment of

[Ross's] remains to the United States because DynCorp wanted to avoid at all costs, for whatever

25

reason, the autopsy we were planning to order ....").  This allegation, however, is just that—an allegation utterly lacking in factual support.

The summary judgment standard requires that the Court construe the facts and make all inferences in the plaintiffs' favor, but it does not command the Court to credit as true naked assertions lacking any basis in the record.  Further, no inference to the plaintiffs' suggested conclusion is required, as the Court need only make inferences in the plaintiffs' favor where those inferences are rationally drawn.  See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986) (To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts.").  Here, the defendants submitted evidence that an autopsy of Ross was performed in Columbia while DynCorp had possession of the remains.  See Defs.' Mot., Ex. 13 (State Department Report, Labeled DYNC00387), at 4.  The plaintiffs' failure to dispute this evidence renders their proposed inference—that DynCorp intentionally delayed sending Ross's remains to Florida to avoid an autopsy "at all costs"—patently irrational in light of the record.  Aside from the undocumented autopsy-avoidance theory, the plaintiffs make no argument and submit no evidence to indicate that a delay of four business days is unusual for an undertaking of this sort.  As such, there are no facts on which a reasonable jury could base a determination that the defendants' conduct was "outrageous" enough to make out the first element the intentional infliction of emotional distress claim.  Accordingly, the Court concludes that the plaintiffs' emotional distress claim cannot survive summary judgment on the basis of DynCorp's delay in transporting Ross's remains.

Secondly, the plaintiffs claim that the consistent refusal of the various DynCorp representatives with whom they spoke between August 1 and August 8 to provide them with the

details of the circumstances surrounding Ross's death was sufficiently outrageous to avoid adverse summary judgment on their emotional distress claim.[9]  The Court notes that although the plaintiffs do not proffer any facts tending to show that any of the DynCorp representatives they spoke to were in a position to know more of the details of the accident than those that were communicated to the plaintiffs, summary judgment requires that the Court infer that those representatives had such knowledge and withheld it for some reason.  This inference, in contrast to the one discussed above, is not unreasonable on contradicted by facts in the record.  The plaintiffs do not make clear what they believe to be DynCorp's reason for withholding the requested information, but the burden nevertheless falls on DynCorp to demonstrate that the conduct at issue was not undertaken with either intent or a reckless disregard for the emotional distress that it might foreseeably cause the plaintiffs.  To discharge this burden, the defendants allege that the Contract contains a provision requiring DynCorp to keep certain information, including the details of Ross's accident, confidential until cleared for release by the State Department.  Defs.' Stmt., ¶ 38.  That provision reads, in relevant part:

> The Contractor and its employees shall exercise the utmost discretion in regard to all matters relating to their duties and functions.  They shall not communicate to any person any <u>information</u> <u>known</u> <u>to</u> <u>them</u> <u>by</u> <u>reason</u> <u>of</u> <u>their</u> <u>performance</u> <u>of</u> <u>services</u> <u>under</u> <u>this</u> <u>contract</u> which has not been made public except in the necessary performance of their duties or upon written authorization of the Contracting Officer .... These obligations do not cease upon the expiration or termination of this contract.

<u>See</u> Defs. Mot., Ex. 2 (Contract), at DYNC 00256-66 (emphasis added).

---

[9]As one further instance of "outrageous" conduct, the plaintiffs maintain that the DynCorp representatives with whom they communicated between August 1 and August 8 discussed Ross's death in a cold and mechanical manner, "callously refer[ring] to Alex as 'that guy' on more than one occasion."  Pls.' Opp. at 26.  Such acts of insensitivity—which the Court necessarily accepts as having actually occurred—while certainly disturbing to a grieving family, just as certainly fit within the category of "mere insults, indignities, ... annoyances, [and] petty oppressions" that do not justify the imposition of liability for intentional infliction of emotional distress.  <u>See</u> RESTATEMENT (SECOND) OF TORTS § 46 cmt. d.

27

The plaintiffs argue that this provision only restricts the communication of "information regarding DynCorp's performance under the contract." Pls.' Opp. at 24 (emphasis added). However, upon closer inspection of the emphasized language, it appears that the contractual language is more faithfully construed to prohibit communication of any information that DynCorp comes to know by reason of its performance under the Contract. This reading is distinct from the interpretation the plaintiffs propose, as in the latter case DynCorp would be contractually bound to withhold all information related to its performance under the Contract as well as all information it learns because of that performance, even if unrelated to performance itself. The details of Ross's death, to be sure, are not directly related to DynCorp's performance under the Contract. But that information certainly became known to DynCorp only because of its performance under the Contract. As such, the Court finds DynCorp's belief that this contractual provision prevented it from giving the plaintiffs all of the information they requested to be reasonable—that is, the belief is predicated upon a reasonable application of a reasonable interpretation of the relevant contractual language.

Disclosure of information that would otherwise remain confidential under this contractual provision is only permitted in two circumstances: (1) where disclosure is required by some other duty imposed on DynCorp by the contract; and (2) where disclosure is authorized, in writing, by the Contracting Officer at the State Department. The plaintiffs, however, have alleged no facts to demonstrate either that DynCorp had a contractual duty to give them the requested information, or that the release of that information had been authorized in writing by the State Department.[10]

---

[10]The plaintiffs maintain, however, that, "given the circumstances, DynCorp certainly could have requested authorization to provide the limited information requested by Plaintiffs." Pls.' Opp. at 24–25. The defendants' response is that "it was clearly appropriate for the specific circumstances surrounding the accident to be fully investigated and fairly analyzed before being reported to [the plaintiffs]. The disclosure of the findings of this investigation to them in the Department of State Report also reflects a reasoned evaluation of the requirements to

Moreover, and importantly, the plaintiffs do not dispute the defendants' assertion that the

information was withheld pursuant to DynCorp's belief that this contractual provision required the

withholding.  See Pls.' Stmt. at 6 (disputing only DynCorp's claim that the cited contractual

provision prevented DynCorp's representatives from responding fully to the plaintiffs' queries).

The District of Columbia Court of Appeals has held that actions taken for undisputedly

legitimate business reasons cannot, by definition, be "extreme and outrageous" in support of an

intentional infliction of emotional distress claim.  See Joyner v. Sibley Mem. Hosp., 826 A.2d 362,

373 (D.C. 2003) (citing Kerrigan, 705 A.2d at 628).  Here, the Court finds that the plaintiffs have

proffered no facts to demonstrate that DynCorp withheld information from the plaintiffs for any

reason other than a clearly legitimate business reason—the desire to avoid violating its contractual

duties.  Thus, DynCorp's withholding of information was not, as a matter of law, "extreme or

outrageous" conduct, and cannot preserve the plaintiffs' emotional distress claim against summary

judgment.

Having determined that neither instance of DynCorp's allegedly tortious conduct actually

constitutes the type of "extreme and outrageous" behavior required to set out the first necessary

element of a prima facie case for intentional infliction of emotional distress, it follows that the

plaintiffs cannot make out the second essential element—intent or recklessness—which, in the

absence of direct evidence, must be implied from the "outrageousness" of the offending conduct.

---

safeguard all information related to the duties and functions of all DynCorp employees."  Defs.' Reply at 14.
     Effectively, then, DynCorp asserts that it did not "request authorization to provide the limited information" that the plaintiffs requested because DynCorp believed that it was more "appropriate" to allow the State Department to fully investigate the accident before reporting the details to the family.  The plaintiffs introduce no facts and make no argument to show that DynCorp's belief in this regard was unreasonable, much less "extreme" or "outrageous"—but rather only offer the tautological statement that DynCorp "could" have requested authorization to disclose.  Of course DynCorp could have made such a request, but it has cited a legitimate business reason for choosing not to do so.  As such, the Court concludes that this contention also fails to raise any triable issue of fact concerning the "outrageousness" of DynCorp's conduct.

Here, the plaintiffs present no direct evidence of intent or recklessness, and are not, for the foregoing reasons, entitled to an inference of intent or recklessness from the character of the defendants' challenged conduct.

In order to survive summary judgment, a plaintiff must demonstrate that there is some evidence for each essential element of each claim asserted. A defendant, however, need only negate one such element in order to prevail. Here, the plaintiffs' intentional infliction of emotional distress claim lacks a triable fact issue concerning not just one, but two essential elements. Thus, the Court concludes that the defendants are entitled to judgment as a matter of law on this claim as well.[11]

---

[11]The plaintiffs have indicated more than once that if the Court rules unfavorably on their claim for intentional infliction of emotional distress, they will seek leave to amend their complaint in order to add a D.C. law claim against DynCorp for negligent interference with a family's right to possess the remains of a deceased loved one. See Pls.' Opp. to Defs.' Amended Mot. to Dismiss, Docket No. 7, at 11 n.8; Pls.' Opp. at 25 n.14. Under Federal Rule of Civil Procedure 15(a), where, as here, an answer to a complaint has been filed, the complaint may only be amended with leave of the Court, which "shall be freely given when justice so requires." FED. R. CIV. P. 15(a).

To be sure, our jurisdiction recognizes the right, under District of Columbia common law, of a deceased's surviving spouse "to possess, preserve and bury, or otherwise dispose of, [the] dead body." Mackey v. United States, 8 F.3d 826, 830 (D.C. Cir. 1993) (quoting Steagall v. Doctors Hosp., Inc., 171 F.2d 352, 352 (D.C. Cir. 1948). This common law right is only actionably violated, however, where the decedent's surviving spouse is permanently deprived of possession of the decedent's remains. See Washington v. John T. Rhines Co., 646 A.2d 345, 351 (D.C. 1994) (recovery under this cause of action does not extend "beyond vindication of the right to possess, and eventually to bury, the decedent's body"). Furthermore, this D.C.-law right only vests in the decedent's surviving spouse, and does not extend to other members of the decedent's family, even if there is no surviving spouse. See id. at 350–51. The plaintiffs in this case are Ross's parents and sister, and thus have no standing to bring the claim that they propose through an amendment to the present complaint. Furthermore, even if the claim were lodged by Ross's surviving spouse, assuming that he was married, it would fail as a matter of law because Ross's remains were returned to his family on August 8. In order to state a prima facie claim for negligent interference with the right to possess the remains of a loved one, a surviving spouse must allege that he or she was permanently deprived of possession. No such allegation may be sustained on these facts.

While a court is instructed by the Federal Rules of Civil Procedure to grant leave to amend a complaint "freely," it need not do so where the only result would be to waste time and judicial resources. Such is the case where the Court determines, in advance, that the claim that a plaintiff plans to add to his or her complaint must fail, as a matter of law, in light of the record in the case. Few circumstances come to mind in which "justice" might "require" a Court to permit the addition of a doomed claim when the inevitable result is summary dismissal pursuant to Rule 12(b)(6). Accordingly, the Court will not grant the plaintiffs in this case leave to amend their complaint to add the cause of action they propose.

## **CONCLUSION**

For the foregoing reasons, the Court concludes that the plaintiffs' negligence-based claims are barred by the exclusive remedy provisions of the Defense Bases Act, and that the plaintiffs' intentional infliction of emotional distress claim lacks sufficient evidentiary support to survive summary judgment.  The Court will therefore grant the defendants' motion for summary judgment as to all of the plaintiffs' causes of action, and will enter judgment in favor of the defendants and dismiss this case with prejudice.

A corresponding Order setting forth the Court's Judgment in this case shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, March 31, 2005.